UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PLATINUM BLACKSTONE PTY LTD, formerly known as NEXBIS PTY LTD, Kordamentha, Level 5, 2 Chifley Square, Sydney, NSW 2000, Australia, <br><br>              Petitioner, <br> v. <br><br> THE GOVERNMENT OF THE REPUBLIC OF MALDIVES, Ministry of Foreign Affairs, Malé, Republic of Maldives, 20077, <br><br>              Respondent. | No. _____ |

## PETITION TO CONFIRM ARBITRAL AWARD

Petitioner Platinum Blackstone Pty Ltd, formerly known as Nexbis Pty Ltd, by and through its attorneys MoloLamken LLP, respectfully submits this petition to confirm, recognize, and enforce a foreign arbitral award against respondent The Government of the Republic of Maldives.

## NATURE OF THE PROCEEDING

1. This is an arbitral enforcement proceeding under Chapter 2 of the Federal Arbitration Act, 9 U.S.C. §§ 201 *et seq.*, and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 (the "New York Convention"). Petitioner Platinum Blackstone Pty Ltd ("Platinum Blackstone"), formerly known as Nexbis Pty Ltd, seeks to confirm an arbitral award rendered in its favor against the Government of the Republic of Maldives (the "Republic"). The Award was rendered by a tribunal of the Singapore International Arbitration Centre in *In the Matter of an Arbitration*

*under the Arbitration Rules of the Singapore International Arbitration Centre SIAC Rules (5th edition, 1 April 2013), ARB No. 003 of 2014, between Nexbis Pty Ltd (formerly known as Nexbis Limited) and the Government of the Republic of Maldives (represented by the Department of Immigration and Emigration).*

2. The arbitral tribunal issued its Final Award on November 24, 2016. The Award was registered in the SIAC Registry as Award No. 132 of 2016. A duly certified copy of the Award is attached as Exhibit A to the accompanying Declaration of Robert K. Kry. The Award ordered the Republic to pay damages of USD $17,085,654 plus fees and expenses of SGD $1,093,371. As of December 31, 2018, the total amount due with interest is **USD $19,949,585**.

3. The arbitration arose out of a Concession Agreement for the Maldives Immigration Border Control System between the Republic and Platinum Blackstone, dated October 17, 2010. A duly certified copy of the Concession Agreement is attached as Exhibit B to the Kry Declaration. Section 19.3 contains an arbitration agreement by which the Republic agreed to submit this dispute to the Singapore International Arbitration Centre.

4. The Republic has refused to pay any of the amounts due under the Award. Platinum Blackstone therefore brings this action to enforce the Award pursuant to the New York Convention and the Federal Arbitration Act.

## PARTIES

5. Petitioner Platinum Blackstone Pty Ltd is a corporation incorporated and registered in Australia, whose registered office is at Kordamentha, Level 5, 2 Chifley Square, Sydney, NSW 2000, Australia. At the time it entered into the Concession Agreement with the Republic, Platinum Blackstone was known as Nexbis Limited. On or about August 13, 2012,

Nexbis Limited changed its name to Nexbis Pty Ltd, the name that appears on the Award. On October 18, 2016, Nexbis Pty Ltd changed its name again to Platinum Blackstone Pty Ltd, the current name of the company. Copies of the corporate resolutions effecting those name changes, as filed with the Australian Securities and Investments Commission, are attached as Exhibits C and D to the Kry Declaration.

6. Respondent is the Government of the Republic of Maldives, a foreign sovereign.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this petition to confirm a foreign arbitral award against a foreign sovereign pursuant to 28 U.S.C. § 1330(a), 28 U.S.C. § 1331, and 9 U.S.C. § 203.

8. The Republic is not entitled to sovereign immunity because this is an action to confirm an arbitral award governed by the New York Convention, a treaty providing for the recognition and enforcement of arbitral awards to which the United States is a party. Accordingly, this matter falls within the Foreign Sovereign Immunities Act's exception for arbitral enforcement, 28 U.S.C. § 1605(a)(6).

9. The Republic also is not entitled to sovereign immunity because it impliedly waived its immunity by agreeing to arbitrate this dispute with Platinum Blackstone. Accordingly, this matter falls within the Foreign Sovereign Immunities Act's waiver exception, 28 U.S.C. § 1605(a)(1).

10. This Court has personal jurisdiction over the Republic pursuant to 28 U.S.C. § 1330(b) because the Republic is a foreign sovereign; it is not entitled to immunity for the reasons above; and it will be duly served as set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1608(a).

11. Venue is proper in this district under 28 U.S.C. § 1391(f)(4) and 9 U.S.C. § 204.

## STATEMENT OF FACTS

### *The Concession Agreement*

12. This dispute arises out of an October 17, 2010 Concession Agreement between Platinum Blackstone and the Republic. Kry Decl. Ex. B. In that agreement, Platinum Blackstone agreed to design, supply, install, and implement the Maldives Immigration Border Control System, an information technology system that would track the crossings of travelers at the Republic's entry and exit points. *Id.* § 2.1.

13. As compensation for designing and operating that system, the Concession Agreement authorized Platinum Blackstone to impose charges for travelers crossing the border. Kry Decl. Ex. B § 2.1. The contract specified a rate of USD $2.00 for "[e]ach and every passenger using [a] non-Maldivian passport arriving into and departing from the Republic of Maldives." *Id.* § 5.2.1(i). To enable Platinum Blackstone to recoup its costs, the contract granted it an exclusive twenty-year concession to operate the system. *Id.* § 2.2.

14. The Republic chose Platinum Blackstone to design the system on September 29, 2010, following a competitive bidding process in which three other firms participated. Kry Decl. Ex. A ¶ 119(a)-(b). Platinum Blackstone completed installation on September 20, 2012, and the Republic certified its acceptance of the system. *Id.* § 119(g)-(h).

15. Between December 2012 and August 2013, Platinum Blackstone sent the Republic a series of invoices for the charges due under the Concession Agreement. Kry Decl. Ex. A ¶ 119(i). The Republic refused to pay. *Id.* Instead, the Republic's parliamentary Budget Review Committee recommended that the agreement be terminated and that the funding obligations be removed from the Republic's budget. *Id.* ¶ 119(k). The Republic adopted that recommendation and purported to terminate the agreement on August 5, 2013. *Id.* ¶ 119(n).

4

16. Section 19.3 of the Concession Agreement contains an arbitration agreement submitting any disputes to the Singapore International Arbitration Centre:

> If any matter, dispute or claim arising out of or relating to this Agreement or the breach or termination hereof is not resolved pursuant to the provisions of Clause 19 above, that matter, dispute or claim shall be referred to an arbitrator to be agreed between the Parties hereto or, failing agreement, the case will be referred to Singapore International Arbitration Centre for arbitration purpose. The decision of an arbitrator shall be final and binding on each of the Parties hereto.

Kry Decl. Ex. B § 19.3.1. Platinum Blackstone sent multiple letters to the Republic in an attempt to resolve the dispute without arbitration, but those efforts were unsuccessful. Kry Decl. Ex. A ¶ 119(p)-(q). On January 9, 2014, Platinum Blackstone invoked the arbitration clause and served a notice of arbitration. *Id.* ¶ 119(r).

### *The Arbitration and Award*

17. SIAC appointed an arbitrator on February 21, 2014. Kry Decl. Ex. A ¶ 6. Over the following two years, the parties served numerous pleadings and other submissions spanning hundreds of pages, with thousands of pages of exhibits. *Id.* ¶¶ 14-117. The arbitrator held a two-week merits hearing in October 2015 at which he heard from seven fact and expert witnesses. *Id.* ¶¶ 124-126.

18. The Republic initially claimed that the tribunal lacked jurisdiction because Platinum Blackstone had not made sufficient efforts to resolve the dispute before commencing arbitration. Kry Decl. Ex. A ¶ 123. In a post-hearing submission, however, the Republic expressly waived that objection, confirming that it would "no longer pursue" the argument that "this Tribunal has no jurisdiction to hear the dispute." *Id.* ¶ 136.

19. On November 24, 2016, the arbitrator rendered a 259-page Final Award concluding that the Republic had breached the Concession Agreement and awarding damages, fees, and expenses to Platinum Blackstone. Kry Decl. Ex. A ¶ 376.

20. The arbitrator rejected each of the Republic's defenses. The Republic first argued that the doctrine of frustration excused its performance because the decision of its parliamentary Budget Review Committee to cease funding its obligations under the agreement made it impossible to perform. Kry Decl. Ex. A ¶142. Platinum Blackstone responded that, under basic principles of state responsibility, the Republic was accountable for the acts of its own legislature, so Parliament's refusal to fund the contract was no defense. *Id.* ¶¶169-170. The arbitrator did not reach that issue, however, because he concluded that the Budget Review Committee had no power to recommend termination of the agreement in any event. *Id.* ¶¶171-172.

21. The Republic next argued that its performance was excused under a provision of the contract that authorized the Republic to terminate the agreement if Platinum Blackstone became insolvent – *i.e.*, "stop[ped] payment or [was] unable to pay its debts." Kry Decl. Ex. A ¶173 (citing Kry Decl. Ex. B § 11.1.1). Platinum Blackstone responded that it was not insolvent and, if its financial condition had deteriorated, it was only because of the Republic's own breaches – including its failure to pay invoices for almost a year. *Id.* ¶185. The arbitrator found no evidence that Platinum Blackstone had stopped paying its creditors or was unable to pay its debts. *Id.* ¶¶189-195. And regardless, the company easily could have cured any default, had the Republic given timely notice, because it could have obtained bank financing secured by the receivables under the Concession Agreement. *Id.* ¶¶196-197.

22. The Republic also argued that the Concession Agreement was unenforceable because it was tainted by corruption in the bidding process. Kry Decl. Ex. A ¶271. The Republic did not present any testimony or other first-hand evidence of corruption. Instead, it relied entirely on an earlier government report that had identified certain irregularities in the bidding process. *Id.* For example, the technical committee evaluating bids had initially

considered a criterion, "capacity building," that was not specified in the Request for Proposals – an irregularity that resulted in the initial evaluations being discarded and the process redone. *Id.* ¶280. At a later stage, moreover, the committee scored bids separately for three different categories of proposed fees, even though the Request for Proposals had called for the fees to be scored collectively. *Id.* ¶¶283, 286. That change, however, was made before the committee knew the terms of any particular bid. *Id.* ¶286.

23. The arbitrator found no evidence sufficient to invalidate the contract. The use of the "capacity building" criterion was irrelevant because any effect was neutralized when the original evaluations were discarded. Kry Decl. Ex. A ¶305. As for the separate scores for different fee components, the evidence was not sufficient to show that the committee adopted that approach to benefit any particular bidder. *Id.* ¶316. There was no evidence that committee members had received any payment or other benefit for their actions. *Id.* ¶328. And there was no evidence that Platinum Blackstone knew anything about the irregularities, foreclosing any claim of complicity. *Id.* ¶¶306, 316, 329.

24. While rejecting each of the Republic's defenses to liability, the arbitrator largely sided with the Republic on damages. Platinum Blackstone claimed more than USD $260 million in damages based primarily on a liquidated damages clause that entitled it to both the value of the completed works and to all future revenues it would have received. Kry Decl. Ex. A ¶199 (citing Kry Decl. Ex. B §12.3). The arbitrator deemed that provision unenforceable on the ground that it was effectively a penalty rather than a genuine pre-estimate of losses. *Id.* ¶211.

25. The parties also disputed the meaning of the contractual provision authorizing Platinum Blackstone to charge USD $2.00 for "[e]ach and every passenger . . . arriving into and departing from the Republic of Maldives." Kry Decl. Ex. B §5.2.1(i). Platinum Blackstone

construed that provision to call for $2 on entry and $2 on exit, for a total of $4, while the Republic construed it to call for only a single $2 fee for both entry and exit. Kry Decl. Ex. A ¶232. After an exhaustive review of the language of the provision, its drafting history, and the parties' subsequent conduct, the arbitrator agreed with the Republic's position that the contract authorized only a single $2 charge. *Id.* ¶¶237-270.

26. The parties' financial experts agreed that, if the arbitrator construed the contract to provide for only a single $2 charge, the amount of Platinum Blackstone's lost profits was USD $15.2 million. Kry Decl. Ex. A ¶203. The parties also agreed that the amount due for outstanding invoices calculated on the basis of a single $2 charge was USD $1,885,654. *Id.* ¶¶221-224. The arbitrator accordingly awarded those amounts as damages. *Id.* ¶376(a)-(b).

27. Finally, the arbitrator awarded fees and expenses. Platinum Blackstone claimed over SGD $1.65 million. Kry Decl. Ex. A ¶350. The arbitrator cut that claim by nearly half, awarding SGD $660,000 in fees and SGD $216,071 in expenses. *Id.* ¶¶372, 375. The arbitrator also ordered the Republic to pay all of the arbitrator's fees and expenses of SGD $391,108 as well as SIAC's fees and expenses of SGD $43,493 (Platinum Blackstone seeks confirmation of only half those amounts in its favor, the parties having previously each paid a 50% share). *Id.* ¶376. The total fee and expense award recoverable in this proceeding is thus SGD $1,093,371.

28. The Award does not expressly provide for post-award interest. Pursuant to Section 20(3) of the Singapore International Arbitration Act, however, the award bears interest at Singapore's post-judgment interest rate, currently 5.33% throughout the relevant period. As of December 31, 2018, the total amount due with interest is **USD $19,949,585**. A claim calculation is attached as Exhibit E to the Kry Declaration; Section 20(3) of the Singapore International

8

Arbitration Act is attached as Exhibit F; and support for the exchange and interest rates is attached as Exhibits G through I.

## GROUNDS FOR ENFORCING THE AWARD

29. The New York Convention is an international treaty signed by over 150 countries that is designed to facilitate and expedite the recognition and enforcement of foreign arbitral awards. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517. To that end, the Convention requires that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." *Id.* art. III, 21 U.S.T. at 2519. The United States is a party to the New York Convention and is bound by its terms. *See New York Arbitration Convention: Contracting States*, http://www.newyorkconvention.org/countries. Singapore, the seat of the arbitration, is likewise a party. *Id.*

30. The New York Convention's goal is "to encourage the recognition and enforcement of commercial arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). That objective is consistent with the "emphatic federal policy in favor of arbitral dispute resolution" – a policy that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). In light of that strong pro-arbitration policy, confirmation proceedings are a "summary procedure." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007). "[T]he showing required to avoid summary confirmation is high" and "rests with the party resisting confirmation." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).

Arbitration Act is attached as Exhibit F; and support for the exchange and interest rates is attached as Exhibits G through I.

## GROUNDS FOR ENFORCING THE AWARD

29. The New York Convention is an international treaty signed by over 150 countries that is designed to facilitate and expedite the recognition and enforcement of foreign arbitral awards. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517. To that end, the Convention requires that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." *Id.* art. III, 21 U.S.T. at 2519. The United States is a party to the New York Convention and is bound by its terms. *See New York Arbitration Convention: Contracting States*, http://www.newyorkconvention.org/countries. Singapore, the seat of the arbitration, is likewise a party. *Id.*

30. The New York Convention's goal is "to encourage the recognition and enforcement of commercial arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). That objective is consistent with the "emphatic federal policy in favor of arbitral dispute resolution" – a policy that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). In light of that strong pro-arbitration policy, confirmation proceedings are a "summary procedure." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007). "[T]he showing required to avoid summary confirmation is high" and "rests with the party resisting confirmation." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).

Arbitration Act is attached as Exhibit F; and support for the exchange and interest rates is attached as Exhibits G through I.

## GROUNDS FOR ENFORCING THE AWARD

29. The New York Convention is an international treaty signed by over 150 countries that is designed to facilitate and expedite the recognition and enforcement of foreign arbitral awards. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517. To that end, the Convention requires that "[e]ach Contracting State shall recognize arbitral awards as binding and enforce them in accordance with the rules of procedure of the territory where the award is relied upon, under the conditions laid down in the following articles." *Id.* art. III, 21 U.S.T. at 2519. The United States is a party to the New York Convention and is bound by its terms. *See New York Arbitration Convention: Contracting States*, http://www.newyorkconvention.org/countries. Singapore, the seat of the arbitration, is likewise a party. *Id.*

30. The New York Convention's goal is "to encourage the recognition and enforcement of commercial arbitration agreements." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974). That objective is consistent with the "emphatic federal policy in favor of arbitral dispute resolution" – a policy that "applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985). In light of that strong pro-arbitration policy, confirmation proceedings are a "summary procedure." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007). "[T]he showing required to avoid summary confirmation is high" and "rests with the party resisting confirmation." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).

31. The United States implemented the New York Convention through Chapter 2 of the Federal Arbitration Act. That statute provides that "[t]he Convention . . . shall be enforced in United States courts in accordance with this chapter." 9 U.S.C. § 201. It specifies:

> Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The ***court shall confirm the award*** unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

9 U.S.C. § 207 (emphasis added). Confirmation is thus ***mandatory*** unless one of the Convention's narrow grounds for non-enforcement applies: "[W]hen an action for enforcement is brought in a foreign state, the state may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *TermoRio*, 487 F.3d at 935.

32. Consistent with the summary nature of enforcement proceedings, the Federal Arbitration Act directs that petitions to confirm awards "shall be made and heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. §§ 6, 208. The Court thus considers the petition, the supporting affidavits, and any timely filed opposition and reply, and enters judgment granting or denying the petition. *TermoRio*, 487 F.3d at 940; *see also Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 149 n.2 (D.D.C. 2018) (respondent must "include[ ] all arguments and supporting affidavits for denial of the Petition in its response to the Petition, rather than submitting them in piecemeal fashion").

33. The Award in this case falls within the scope of the Convention. Under the Federal Arbitration Act, "[a]n arbitration agreement or arbitral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention" unless it arises out of a "relationship which is entirely between citizens of the United States."

9 U.S.C. § 202. Those requirements are met. The Award arises out of a commercial concession agreement for the design, implementation, and operation of a border control system, and no party is a citizen of the United States.

34. Although the Republic of Maldives has not ratified the New York Convention, that fact is irrelevant to this proceeding. The Convention provides that, upon ratification, "any State may on the basis of reciprocity declare that it will apply the Convention to the recognition and enforcement of awards made only in the territory of another Contracting State." Art. I.3, 21 U.S.T. at 2519. The United States made such a declaration. 21 U.S.T. at 2566. That condition is satisfied here because the seat of the arbitration – Singapore – has ratified the Convention. By contrast, no provision of the Convention conditions its applicability on whether the opposing party in the arbitration is a sovereign that has ratified the Convention. By agreeing to arbitrate in a Convention state, the Republic must have contemplated that any Award would be enforceable under the Convention's terms.

35. Article IV of the Convention requires a party seeking recognition and enforcement of an award to submit "[t]he duly authenticated original award or a duly certified copy thereof" as well as "[t]he original [arbitration] agreement . . . or a duly certified copy thereof." 21 U.S.T. at 2519-20. Petitioners have submitted those materials. Kry Decl. Exs. A, B.

36. No ground for denial of recognition exists. "[T]he Convention is 'clear' that a court 'may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention.'" *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012). None of those grounds applies here.

37. Article V.1(a) permits non-enforcement where one of the parties to the arbitration agreement was "under some incapacity" or where the agreement was "not valid under the law to

which the parties have subjected it." 21 U.S.T. at 2520. That provision does not apply here. The Republic has never contended that it was under some incapacity when it entered into the arbitration clause or that the arbitration clause itself was invalid. The Republic did claim that the Concession Agreement *as a whole* was invalid because it was purportedly tainted by corruption during the bidding process. Kry Decl. Ex. A ¶271. The tribunal properly rejected that claim as unsupported by the evidence. *Id.* ¶¶305-306, 316, 328-329. But even if the claim had any arguable merit, it would not be a basis for voiding the arbitration clause. Under well-settled severability principles, a party cannot challenge an arbitral award by disputing the validity of the broader contract in which the arbitration clause appears – the party must bring a specific challenge to the arbitration clause itself. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006) ("[A]s a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 102-03 (D.C. Cir. 2015) (similar). The Republic has never claimed that the purported irregularities in the bidding process had any specific relation to the arbitration clause.

38. Article V.1(b) of the Convention permits non-enforcement where the party "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case." 21 U.S.T. at 2520. That provision does not apply either. The Republic participated vigorously in the arbitration over two years, filing hundreds of pages of briefing with thousands of pages of exhibits and participating in a two-week merits hearing with numerous fact and expert witnesses. Kry Decl. Ex. A ¶¶14-117, 124-126. The Republic never claimed that it lacked notice or was denied an opportunity to respond.

39. Article V.1(c) of the Convention permits non-enforcement where the Award "deals with a difference not contemplated by or not falling within the terms of the submission to

12

arbitration" or "contains decisions on matters beyond the scope of the submission to arbitration." 21 U.S.T. at 2520. That provision does not apply. The Concession Agreement's arbitration clause covers "any matter, dispute or claim arising out of or relating to this Agreement or the breach or termination hereof." Kry Decl. Ex. B §19.3.1. That broad language clearly encompasses this dispute. The Republic never claimed otherwise. The only jurisdictional challenge it raised was that Platinum Blackstone had not sufficiently complied with pre-filing negotiation requirements. Kry Decl. Ex. A ¶123. But the Republic *expressly waived* that jurisdictional objection during the arbitration, declaring that it would "no longer pursue" the argument that "this Tribunal has no jurisdiction to hear the dispute." *Id.* ¶136.

40. Article V.1(d) permits non-enforcement where "[t]he composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties." 21 U.S.T. at 2520. Nothing like that occurred here: The arbitrator was appointed and the arbitration conducted pursuant to SIAC rules, just like the parties specified. *Compare* Kry Decl. Ex. B §19.3.1 (case "will be referred to Singapore International Arbitration Centre for arbitration"); Kry Decl. Ex. A ¶6 (appointment of arbitrator under SIAC rules).

41. Article V.1(e) permits non-enforcement where "[t]he award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." 21 U.S.T. at 2520. The Award here is final and binding and has not been set aside by the Singapore courts. Singapore law requires that any action to set aside the award be brought within three months. *See* Singapore International Arbitration Act §3(1) & sched. 1 §34(3) (attached as Kry Decl. Ex. F). That deadline passed long ago.

42. Article V.2(a) requires non-enforcement where "[t]he subject matter of the difference is not capable of settlement by arbitration under the law of th[e] country" where enforcement is sought. 21 U.S.T. at 2520. This dispute clearly would have been arbitrable under United States law. *See* 9 U.S.C. § 2.

43. Finally, Article V.2(b) requires non-enforcement where "recognition or enforcement of the award would be contrary to . . . public policy." 21 U.S.T. at 2520. That exception is "construed narrowly" and "applie[s] only where enforcement would violate the United States' most basic notions of morality and justice." *Belize Bank Ltd. v. Gov't of Belize*, 852 F.3d 1107, 1111 (D.C. Cir. 2017) (alteration omitted). No such circumstance is present here. The arbitrator carefully considered the Republic's allegations of corruption in the bidding process and found them to be groundless. There was no evidence that the review committee modified the scoring to benefit a particular bidder or that committee members benefited in any way. Kry Decl. Ex. A ¶¶ 316, 328. And there was no evidence that Platinum Blackstone knew about any purported irregularities. *Id.* ¶¶ 306, 316, 329. Thus, even assuming there is a public policy against corruption, it does not violate that policy to confirm an award that fully considered allegations of corruption and found them to be lacking. *See BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016) (rejecting public policy argument because "[t]he arbitral tribunal did not find any corruption"); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 5 F. Supp. 3d 25, 43 (D.D.C. 2013) (similar), *aff'd*, 794 F.3d 99 (D.C. Cir. 2015); *cf. Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016).

44. The Court should therefore confirm the Award in its entirety. The portion of the Award corresponding to fees and costs, which was denominated in Singapore dollars, should be converted to U.S. dollars at the exchange rate prevailing on the date of judgment. *See Cont'l*

*Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 932 F. Supp. 2d 153, 158 (D.D.C. 2013) (conversion of foreign currency award into U.S. dollars at judgment "is the norm, rather than the exception"), *aff'd*, 603 F. App'x 1 (D.C. Cir. 2015).

45. In addition, the Court should grant post-award, pre-judgment interest through the date of judgment. Although the Award itself does not specify an interest rate, courts normally grant pre-judgment interest even when the award is silent. *See Cont'l Transfert*, 932 F. Supp. 2d at 163-64 (prejudgment interest "should normally be awarded when damages have been liquidated by an international arbitral award"); *Compagnie des Bauxites de Guinee v. Hammermills, Inc.*, No. 90-0169, 1992 WL 122712, at *8 (D.D.C. May 29, 1992) ("Courts have consistently allowed prejudgment interest in actions brought to confirm arbitral awards."); *Waterside Ocean Navigation Co. v. Int'l Navigation Ltd.*, 737 F.2d 150, 153-54 (2d Cir. 1984) (similar). Post-award interest is particularly appropriate where, as here, the petitioner would be entitled to interest under the local law where the award was rendered. *See Waterside Ocean Navigation*, 737 F.2d at 154 (awarding interest in part because petitioner "could have obtained post-award, pre-judgment interest by seeking confirmation of the awards in English courts"); Kry Decl. Ex. F (Singapore law providing for interest on arbitral awards).

46. This Court has discretion over what interest rate to use. *See Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996); *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 603 F. App'x 1, 5 (D.C. Cir. 2015). In this case, the Court should award interest at the Singapore statutory rate for post-award interest. That rate is specifically tailored to awards and judgments rendered in Singapore. Adopting that rate affords appropriate deference to Singapore as the seat of the arbitration with primary jurisdiction over the Award. Moreover, awarding interest at that rate ensures that the Republic will pay the same amount whether the

Award is ultimately collected here or in Singapore.  Alternatively, the Court should award interest at the U.S. prime rate.  *See Cont'l Transfert*, 932 F. Supp. 2d at 165 (noting "preference . . . for the use of the prime rate rather than the statutory postjudgment interest rate"); *Belize Soc. Dev.*, 5 F. Supp. 3d at 43  (applying prime rate).  In either case, interest should be calculated on a compound rather than simple basis.  *See Cont'l Transfert*, 932 F. Supp. 2d at 166 n.7 (compounding is "standard practice").

47. Claim calculations as of December 31, 2018, for both the Singapore statutory interest rate and the U.S. prime rate, are attached as Exhibit E to the Kry Declaration.  Support for the relevant exchange rate and interest rates is attached as Exhibits F through I.  In the event the Court grants this petition to confirm the Award, petitioner will submit an updated claim calculation with the proposed form of judgment.

48. WHEREFORE, petitioner respectfully requests an order:

   a. granting this petition;

   b. recognizing, confirming, and enforcing the Award in its entirety;

   c. directing that judgment be entered thereon in favor of Platinum Blackstone and against the Republic in the amount of USD $17,085,654, plus fees and expenses of SGD $1,093,371 as converted to U.S. dollars on the date of judgment, plus post-award interest as set forth above or as otherwise provided by law, all such amounts comprising **USD $19,949,585** as of December 31, 2018;

   d. awarding such other fees, costs, and interest as may be recoverable in this proceeding, including post-judgment interest as provided by law; and

   e. granting such other and further relief that the Court deems just and proper.

| | | |
|---|---|---|
| Dated: | January 30, 2019<br>Washington, D.C. | Respectfully submitted, |

    /s/ Robert K. Kry
Robert K. Kry
D.C. Bar # 490545
MOLO LAMKEN LLP
The Watergate, Suite 660
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
Tel.: (202) 556-2011
Fax: (202) 556-2001
rkry@mololamken.com

*Attorney for Petitioner*